IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
April 18, 2017 Session

## MICHAEL GOODRUM v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Maury County**
**No. 20549     Robert L. Jones, Judge**

_____

### No. M2016-00684-CCA-R3-PC
_____

The petitioner, Michael Goodrum, appeals the denial of post-conviction relief from his 2012 Maury County Circuit Court jury convictions of possession with intent to sell .5 grams or more of cocaine within 1,000 feet of a park and possession with intent to sell .5 grams or more of cocaine within 1,000 feet of a school, for which he received a sentence of 15 years. In this appeal, the petitioner contends that he was denied the effective assistance of counsel and that the cumulative effect of his counsel's errors prevented him from receiving a fair trial. Discerning no error, we affirm.

**Tenn. R. App. P. 3; Judgment of the Circuit Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and CAMILLE R. MCMULLEN, JJ., joined.

John M. Schweri, Columbia, Tennessee, for the appellant, Michael Goodrum.

Herbert H. Slatery III, Attorney General and Reporter; Sophia S. Lee, Assistant Attorney General; Mike Bottoms, District Attorney General; and Patrick Powell, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

The Maury County Grand Jury charged the petitioner with one count each of possession with intent to sell .5 grams or more of cocaine within 1,000 feet of a park and possession with intent to sell .5 grams or more of cocaine within a drug-free school zone. The petitioner's first trial ended in a hung jury, but the petitioner was convicted as charged in a second trial in 2012. The trial court merged the alternative counts and imposed the mandatory minimum 15-year sentence. This court affirmed the convictions on direct appeal. *See State v. Michael Goodrum*, No. M2012-02066-CCA-R3-CD (Tenn. Crim. App., Nashville, March 20, 2014), *perm. app. denied* (Tenn. Aug. 29, 2014).

The evidence adduced at the petitioner's trial established that members of the Columbia Police Department ("CPD") executed a search warrant at 504 East 9th Street on the night of July 9, 2008, following a controlled purchase of crack cocaine through a confidential informant. *Id.*, slip op. at 2. Both Raven Fleming and Gary Fleming were initially named in the search warrant. *Id.* Following the execution of the warrant, both Robert Fitzgerald and the petitioner were added to the search warrant. *Id.* CPD Officer Jason Dark described the events that unfolded thusly:

> Officer Dark said that when he and his team arrived at the Flemings' residence to execute the search warrant, Trammell Jennings, a known drug dealer, was in the front yard. Jennings saw the police and fled from the scene on foot. Due to this compromise, five or six officers quickly entered the residence through the front door. Upon entry, the officers identified themselves as police and told everyone inside to get on the ground and show their hands. Officers secured the scene and Sergeant Haywood advised the persons inside of their *Miranda* rights. When Officer Dark entered the residence, he saw the [petitioner] lying on the living room floor "just beyond the front door." He also saw Raven Fleming in the living room with the [petitioner]. Ms. Fleming was lying on the floor in front of the couch. A person named Gary Brown was in the area beyond Ms. Fleming and the [petitioner]. Robert Fitzgerald, a known drug dealer, was found in the kitchen.

> Officer Dark testified that when he first saw the [petitioner], Sergeant Haywood was securing him. Officer Dark was preparing the residence for a search when Sergeant Haywood called him over to the area of the [petitioner]. Officer Dark observed the [petitioner] on his side and a bag of crack cocaine underneath the chest area where he had been lying. Officer Dark said that Sergeant Haywood searched the [petitioner] and did not find a crack pipe or anything else for smoking crack cocaine. To Officer Dark's knowledge, the [petitioner] did not have anything on his person such as a weapon, scales, a cell phone, or substantial currency.

> During the execution of the search, the police found a bag of marijuana behind the couch, Xanax pills in Ms.

- 2 -

Fleming's bedroom closet, and ecstasy pills on the kitchen counter near where Mr. Fitzgerald was secured. The police also found a crack pipe on Mr. Brown's person, but no drugs. A total of $291 was seized from Ms. Fleming. According to Officer Dark, Ms. Fleming was subsequently charged with possession of marijuana and the Xanax pills; Mr. Fitzgerald was charged with possession of the ecstasy pills; Mr. Brown was charged with possession of the crack pipe; and the [petitioner] was charged in the case sub judice. Officer Dark testified that the bag found beneath the [petitioner] was secured as evidence and sent to the Tennessee Bureau of Investigation (TBI) Crime Laboratory for testing. He said the TBI analysis determined the substance to be crack cocaine in the amount of 1.7 grams. . . .

*Id.*, slip op. at 2-3.

Officer Dark testified that 504 East 9th Street "was located within a 1,000 feet radius of both Frierson-Johnson Park and College Hill School." *Id.*, slip op. at 4. After using a computer program to assess the distance between the residence and the park and school, Officer Dark personally measured the distance between the relevant points using a counter wheel with a tape measure and verified that the computer measurements were accurate. *Id.*

CPD Sergeant Jeremy Haywood testified that he was "the third or fourth person to enter" the subject residence and that he "encountered the [petitioner] in the living room near the front door." *Id.*

The [petitioner] was in the process of getting to the floor as ordered. Sergeant Haywood also observed Ms. Fleming make her way from the couch to the floor. Until the scene was secured, Sergeant Haywood remained in the living room and monitored Ms. Fleming and the [petitioner] as they were lying face down on the floor with their hands at their sides.

Sergeant Haywood subsequently searched the [petitioner] for weapons and handcuffed him. The [petitioner] did not have anything in his pockets. Immediately upon rolling the [petitioner] over on his side, Sergeant Haywood saw "[a] plastic bag with white rock type substance that appeared to be crack cocaine" underneath the

[petitioner's] chest and stomach area. He then called for Officer Dark to come observe the substance. According to Sergeant Haywood, "[the petitioner] was adamant that it wasn't his drugs." He did not see any drugs in the [petitioner's] hands when he entered the residence. He also did not observe any objects being thrown in the [petitioner's] direction, either through the air or across the floor. Sergeant Haywood testified that he did not know how the drugs ended up on the floor. He said he would not have been able to observe the [petitioner] if he had dropped the drugs from his hand and laid on them.

*Id.*, slip op. at 4-5.

TBI Special Agent and Forensic Scientist Laura Adams testified as an expert witness in the area of controlled substance identification. *Id.*, slip op. at 5. Agent Adams "analyzed a 'rock-like substance' and determined that it contained cocaine and weighed 1.7 grams." *Id.*

Mary H. Carter, a supervisor with the Maury County school system, testified that the Horace Porter School at College Hill was a public, alternative school in July 2008. *Id.* The petitioner did not testify and presented no proof. *Id.*

On August 24, 2015, the petitioner filed, pro se, a timely petition for post-conviction relief, alleging, *inter alia*, that he was deprived of the effective assistance of counsel. Following the appointment of counsel and the amendment of the petition, the post-conviction court conducted an evidentiary hearing on February 5, 2016.

At the evidentiary hearing, trial counsel testified that he was appointed to represent the petitioner in August 2009, shortly after the public defender's office had been removed from the petitioner's case due to an unspecified conflict. Trial counsel successfully petitioned to dismiss the petitioner's initial indictment due to insufficient language regarding the drug-free school zone act. A superseding indictment was later issued, and both of the petitioner's trials were based upon that indictment. Trial counsel testified that he was aware that there had been a "prior incident" in Raven Fleming's house shortly before the incident giving rise to the petitioner's arrest, but trial counsel did not know that Ms. Fleming's residence had been searched and that she had been charged with possession with intent to sell cocaine just three weeks prior to the petitioner's arrest at her house.

- 4 -

Trial counsel provided the petitioner with all of his discovery materials. Trial counsel conceded that he had not independently measured the distance between Ms. Fleming's residence and the park and the school but that he had used an online resource to compare the distances between the relevant points. Counsel believed that he had checked the licensure of the park in question prior to trial, but he could not recall doing so with any specificity.

Prior to the petitioner's second trial, counsel recalled speaking with the petitioner by telephone and meeting him with him in counsel's office on "at least four different" occasions. Trial counsel conceded that there "were probably some times [the petitioner] would call . . . to speak with me" when counsel was unavailable but that he "never refused access to" the petitioner and would work out "a later time" to speak with the petitioner. Trial counsel recalled speaking with both the petitioner's mother and his "girlfriend at the time" but no additional family members. With respect to the petitioner's decision to testify at trial, trial counsel testified that he had discussed the petitioner's options with him until they had "beat[en] that horse to death." Trial counsel acknowledged that he had sent a letter to the petitioner in January 2012, nearly three months prior to trial, advising the petitioner of the potential perils of testifying in the second trial and enclosing a copy of the petitioner's testimony from the first trial. Trial counsel explained the reasoning for the letter as follows:

> [T]he purpose of this letter, there was – I had a copy of the transcript attached to this. I wanted [the petitioner] to be aware of that. I knew if he were to take the stand on trial number two, again, he was under oath, there's [a] detailed document that the State would be able to cross-examine. If he got off track on what he had testified earlier, you know, the State was just going to make mincemeat out of him in front of a jury. Again, if he were ready – and, again, that's his decision, not mine, but if he so chose, you know, again, this was in January. I wanted him to be aware of it, have a chance to review it so there wouldn't be any surprises if, in fact, he decided to testify at the second trial.

Trial counsel stated that he orally advised the petitioner against testifying in the second trial but made it clear to the petitioner that the decision was his alone.

When asked if he had attempted to verify the petitioner's employment or church membership for purposes of mitigation, trial counsel responded that he would not have done so for trial but that he would have for sentencing if he had not been able to successfully negotiate the minimum available sentence for the petitioner. With respect to

his failure to file a motion to suppress any evidence, trial counsel questioned the standing the petitioner would have had to seek such a motion, given that he was a visitor in Ms. Fleming's residence and that the search warrant at issue did not appear to be defective. Trial counsel testified that he had prepared a diversion application for the petitioner and that the petitioner had qualified for diversion, which counsel believed was instrumental in his sentencing negotiations with the State. Trial counsel admitted that he had not requested the aid of an investigator in the petitioner's case but stated that he had interviewed both Officer Jason Dark and Officer Brian Gray and that he had spoken briefly with Sergeant Haywood prior to trial.

With respect to the nature of the petitioner's charges, counsel stated that he could not "recall a time that we did not discuss the severe nature of what [the petitioner] was charged with." Trial counsel recalled that the petitioner did not wish to accept a plea offer because the petitioner "always indicated . . . that he was innocent of the charge." Counsel continued as follows:

> We talked actual possession, constructive possession, how hard that was under the circumstances to prevail. [The petitioner] said I'm not guilty. I want – I want to argue my case and that's – that's what I did to the best of my ability.
>
> . . . .
>
> Based on [the petitioner's] direction to me, he felt that Mr. Fitzgerald was the most culpable individual in the home that night. He felt there was a possibility Mr. Fitzgerald will take the fall or take the blame for what happened to [the petitioner]. Based on that, I sent a letter to [Mr. Fitzgerald's attorney] asking for permission to talk to Mr. Fitzgerald. Again, I did get the discovery. [The attorney] provided me that. In short, [the attorney's] indication to me was nothing good is going to come out of a discussion. He doesn't have anything good to say about [the petitioner]. It's going to be detrimental to his case. I advised [the petitioner] of that and that's the last I heard about Mr. Fitzgerald.

Trial counsel was adamant that the petitioner "was always articulate" and "well-spoken," and counsel saw nothing that would give rise to any competency concerns with the petitioner. Counsel conceded that, near the end of his representation of the petitioner, he had filed a motion to withdraw based on a letter the petitioner had written to the court in which he claimed that counsel had been keeping him "in the dark." Trial

counsel testified that the petitioner's contention "was completely not true no matter how you cut it." Nevertheless, trial counsel asked to be relieved and argued the motion before the trial court. At that time, the petitioner "seem[ed] to be satisfied" with counsel's representation, and trial counsel continued to represent the petitioner.

On cross-examination, trial counsel agreed that, prior to the first trial, he had successfully negotiated a plea offer of a best interest plea to a misdemeanor sentence of 11 months and 29 days, all suspended to diversion, even though the petitioner was facing a Class A felony conviction with a mandatory minimum sentence of 15 years to serve. The petitioner rejected the offer, and the first trial ended in a hung jury with 11 jurors voting to convict. Prior to the second trial, the State made a plea offer of eight years at 30 percent service, but the petitioner again rejected the offer because he was "hoping for something less than that." After the petitioner was convicted at the second trial, trial counsel successfully negotiated the mandatory minimum sentence of 15 years.

CPD Corporal Jason Dark testified that he had executed a search warrant at 504 East Ninth Street on July 9, 2008, and that the search warrant was based on a controlled buy that had occurred 72 hours earlier. Corporal Dark recalled that as Sergeant Haywood rolled the petitioner over to lift him off of the ground, a bag of crack cocaine was discovered beneath the petitioner's body. Corporal Dark recalled speaking with trial counsel about the case. Corporal Dark confirmed that the petitioner could not be excluded as the source who provided Ms. Fleming with cocaine.

CPD Sergeant Jeremy Haywood testified that he had lifted the petitioner off the ground on the date in question. Sergeant Haywood could not recall whether he had spoken with trial counsel about the petitioner's case.

The petitioner testified that he did not have the opportunity to speak with trial counsel very often and that he had sought new counsel because he "was left in the dark" and because counsel failed to "take time to explain" things to the petitioner. The petitioner testified that trial counsel never visited him while he was incarcerated, but the petitioner conceded that he was out on bond for almost four years. According to the petitioner, he drove to trial counsel's office "10 or 15 times" over a period of several months but that he was never able to meet with trial counsel. The petitioner repeatedly insisted that he "didn't understand any of this," that he was unfamiliar with the law, and that he was confused by the concept of constructive possession. The petitioner testified that he "was never laying on top of the drugs" and that Ms. Fleming was "closest to those drugs" when officers discovered them on the floor.

With respect to his rejection of the misdemeanor plea offer, the petitioner insisted that he "didn't have any knowledge of the law whatsoever" and that he "didn't

understand the things that [trial counsel] was telling" him. The petitioner conceded that he had "messed up" by not accepting the misdemeanor plea offer. The petitioner admitted that he had received all of his discovery materials and that trial counsel had explained that he was eligible for diversion. The petitioner was adamant that he had never received an offer of eight years, explaining that had he received such an offer, he would have accepted it.

The petitioner stated that trial counsel did not include a copy of his testimony from the first trial when counsel sent the letter advising the petitioner about the perils of testifying in the second trial. The petitioner claimed that he "assume[d]" he would testify in the second trial because he had done so in the first trial but that counsel had informed him "[a]bout 10 minutes before we came into the courtroom [that] it would be in [his] best interest not to testify." The petitioner testified that he was simply following the advice of his attorney when he chose not to testify.

The petitioner agreed that he wrote a letter to the court clerk seeking new counsel but that he then chose to stay with trial counsel because the trial court had advised him that he "had one of the best lawyers in town."

On cross-examination, the petitioner admitted that he had received a letter from trial counsel dated May 24, 2010, in which counsel informed the petitioner that he could enter a best interest plea to misdemeanor simple possession and receive a sentence of 11 months and 29 days, all suspended to judicial diversion. The letter continued with the following advice:

> My legal advi[c]e to you is to accept the plea as offered. This is the best negotiating I can do on your behalf and should the case be decided by a jury the outcome is uncertain. The benefit to you is 1) no jail time to serve and being placed on diversion for a misdemeanor offense for which you may have expunged from your record at the end of the successful completion of the 11/29; 2) a best interest plea in that you do not admit any wrongdoing; 3) knowing what you have and being able to resume your life without the risk of an adverse jury decision requiring you to serve a minimum of eight (8) years in the penal system.

With respect to his decision not to testify at the second trial, the petitioner acknowledged that he had "the option to testify" and that he had announced in court, following the *Momon* colloquy, that he did not wish to testify. The petitioner also

conceded that he sent a letter to trial counsel nearly six months after he was convicted at the second trial which stated, in pertinent part, as follows:

> Let me start by saying you did me proud in court and I was glad to see your representation on this day because you touched a lot of good points in my case and truthfully this is going to be a waste of the taxpayers['] money.

Brenda Goodrum, the petitioner's mother, testified that trial counsel never contacted her about the petitioner's case. Ms. Goodrum stated that she never came to court during the petitioner's trials even though she was not working at the time, but she claimed that she was unaware that the petitioner was going to court. Ms. Goodrum attempted to contact trial counsel on multiple occasions but was never successful in reaching him. Ms. Goodrum admitted that she had no knowledge of the events surrounding the petitioner's arrest.

With this evidence, the post-conviction court denied relief, finding no clear and convincing evidence that trial counsel had rendered ineffective assistance of counsel and finding specifically that trial counsel had gone "above and beyond the call of duty in trying to get [the petitioner] to understand the substantial risk of his unwillingness to assume any responsibility for those drugs found under him during the execution of the search warrant in question." In its detailed and comprehensive 13-page order denying relief, the court also made the following findings with respect to the petitioner's specific allegations of ineffective assistance of counsel:

> [The petition] alleges in a conclusory way that trial counsel failed to conduct an adequate pre-trial investigation. There is no merit to that allegation, because the [p]etitioner's conviction resulted from a second jury trial following an earlier trial in which the jury hung 11 to 1 for conviction. Certainly, at the time of the last trial, defense counsel was well aware of all evidence against the [p]etitioner. In addition, trial counsel testified at the PCR hearing that he worked with attorneys for other defendants at the scene of the [p]etitioner's arrest in trying to produce evidence that the drugs were under the control of someone other than the [p]etitioner. Responses from other attorneys were that their clients' testimony would hurt [the petitioner] more than help him. . . . This [c]ourt cannot speculate as to whether further investigation would have revealed more witnesses or what their testimony might have been. . . . Therefore, since the

[p]etitioner failed to present such witnesses at the evidentiary hearing, [this claim] is without merit.

[The petition] criticizes trial counsel for failing to present a defense, specifically not calling a single witness as to the [p]etitioner's character. No character witnesses were called in the PCR hearing, and this [c]ourt has no reason to believe that any effective character witness existed at the time of the trial. The additional allegation . . . that there was no evidence of mitigation or family support seems immaterial in that such evidence would not be admissible in a guilt determination phase of the trial. Since the trial court imposed the minimum sentence, there was no need for trial counsel to offer mitigation or family history evidence at any time on behalf of the [p]etitioner.

[The petition] also alleges that trial counsel should have offered some defense evidence about the [p]etitioner's prior dog sales to show why he may have been at the house being searched for drugs pursuant to a search warrant. Trial counsel could not have pursued that theory in front of the jury because of the outlandish tale the [p]etitioner had presented in his first trial testimony about stopping at and entering this house because he did not have a valid registration plate. In his first trial, he said he had seen several police cars as he approached that block of Ninth Street and concluded that he'd better pull over and try to avoid a driving offense. Any attempt to put on defense evidence about the sale-of-a-dog purpose for the [p]etitioner being at the crime scene would likely have resulted in the State being able to get in all or part of the [p]etitioner's prior testimony as a totally inconsistent reason.

. . . .

[The petition] alleges that trial counsel did not spend enough time communicating with the [p]etitioner between the first and second trial, but this [c]ourt recalls a good bit of time in open court when even the judge encouraged the [p]etitioner to seriously consider alternatives other than a second trial in light of the fact that eleven jurors in the first trial voted to find

the [p]etitioner guilty of an A felony carrying a mandatory minimum of 15 years. There was no particular reason to spend a lot of time on trial preparation itself, and counsel was obviously trying to persuade the [p]etitioner that it was in his best interest to avoid trial, if possible. Any fault for failure to intelligently communicate lies with the [p]etitioner, not with his counsel.

The allegation in [the petition] that . . . trial counsel caused him not to testify is without merit because this [c]ourt conducted a hearing with the [p]etitioner during the trial to ensure that he was aware that the decision of whether to testify was his. . . . The [p]etitioner gave appropriate responses to the [c]ourt's questions and [as]sured that he understood his right to testify or to remain silent.

The factual allegation [that counsel failed to interview witnesses called by the prosecution prior to trial] is not true. [Trial counsel's] testimony showed that he had spoken with officers before the first trial and engaged them in a thorough cross-examination in the first trial, all well before the second trial that resulted in the conviction of which the [p]etitioner complains.

. . . .

[The petition] complains that . . . trial counsel did not adequately challenge the distance measurements testified about by the law enforcement officer, but present counsel and the [p]etitioner offered no evidence in the PCR hearing to indicate that the trial evidence of measurement was anything other than correct. . . . Since the [p]etitioner failed to present any measurement evidence at his evidentiary hearing, [this claim] is without merit.

In this appeal, the petitioner reiterates his claim of ineffective assistance of counsel, claiming that trial counsel performed deficiently by failing to conduct a prompt and adequate pretrial investigation, by failing to prepare for trial and present a defense, and by failing to communicate with the petitioner, and that the cumulative effect of these errors warrant reversal. The State contends that the court did not err by denying relief.

We view the petitioner's claim with a few well-settled principles in mind. Post-conviction relief is available only "when the conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103. A post-conviction petitioner bears the burden of proving his or her factual allegations by clear and convincing evidence. *Id.* § 40-30-110(f). On appeal, the appellate court accords to the post-conviction court's findings of fact the weight of a jury verdict, and these findings are conclusive on appeal unless the evidence preponderates against them. *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997); *Bates v. State*, 973 S.W.2d 615, 631 (Tenn. Crim. App. 1997). By contrast, the post-conviction court's conclusions of law receive no deference or presumption of correctness on appeal. *Fields v. State*, 40 S.W.3d 450, 453 (Tenn. 2001).

Before a petitioner will be granted post-conviction relief based upon a claim of ineffective assistance of counsel, the record must affirmatively establish, via facts clearly and convincingly established by the petitioner, that "the advice given, or the services rendered by the attorney, are [not] within the range of competence demanded of attorneys in criminal cases," *see Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975), and that counsel's deficient performance "actually had an adverse effect on the defense," *Strickland v. Washington*, 466 U.S. 668, 693 (1984). In other words, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. Should the petitioner fail to establish either deficient performance or prejudice, he is not entitled to relief. *Id.* at 697; *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). Indeed, "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Strickland*, 466 U.S. at 697.

When considering a claim of ineffective assistance of counsel, a reviewing court "begins with the strong presumption that counsel provided adequate assistance and used reasonable professional judgment to make all significant decisions," *Kendrick v. State*, 454 S.W.3d 450, 458 (Tenn. 2015) (citing *Strickland*, 466 U.S. at 689), and "[t]he petitioner bears the burden of overcoming this presumption," *id.* (citations omitted). We will not grant the petitioner the benefit of hindsight, second-guess a reasonably based trial strategy, or provide relief on the basis of a sound, but unsuccessful, tactical decision made during the course of the proceedings. *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994). Such deference to the tactical decisions of counsel, however, applies only if the choices are made after adequate preparation for the case. *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

A claim of ineffective assistance of counsel is a mixed question of law and

fact. *Kendrick*, 454 S.W.3d at 457; *Lane v. State*, 316 S.W.3d 555, 562 (Tenn. 2010); *State v. Honeycutt*, 54 S.W.3d 762, 766-67 (Tenn. 2001); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999). When reviewing the application of law to the post-conviction court's factual findings, our review is de novo, and the post-conviction court's conclusions of law are given no presumption of correctness. *Kendrick*, 454 S.W.3d at 457; *Fields*, 40 S.W.3d at 457-58; *see also State v. England*, 19 S.W.3d 762, 766 (Tenn. 2000).

In our view, the record fully supports the denial of relief in this case. Trial counsel's explicitly accredited testimony established that he conducted a thorough pretrial investigation and properly prepared for trial, having effectively communicated with the petitioner and sufficiently advised him regarding his right to testify. Trial counsel's decision to advise the petitioner against testifying in the second trial was based on the need to protect the petitioner against damaging impeachment, given the change in the petitioner's story between trials, and we will certainly not second-guess this reasonable–and advisable–trial strategy. *See Adkins*, 911 S.W.2d at 34. Given the overwhelming evidence against the petitioner, he cannot establish that, but for counsel's alleged errors, the outcome would have differed. *See Strickland*, 466 U.S. at 694. As such, we hold the petitioner has failed to prove by clear and convincing evidence any facts that demonstrate that trial counsel's representation was deficient or prejudicial. Finally, having considered the petitioner's issues on appeal and having concluded that he is not entitled to relief for any, we need not consider the cumulative effect of the alleged errors. *State v. Hester*, 324 S.W.3d 1, 77 (Tenn. 2010) ("To warrant assessment under the cumulative error doctrine, there must have been more than one actual error committed.").

The petitioner failed to establish that he was denied the effective assistance of counsel at trial. Accordingly, the judgment of the post-conviction court is affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE

- 13 -